**MICHAEL D. LONG**
Attorney at Law
California State Bar Number 149475
901 H Street, Suite 301
Sacramento, CA 95814
Telephone: (916) 201-4188
Facsimile: (916) 442-8299
Email: Mike.Long.Law@msn.com

CJA Attorney for STEEL DAVIS

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STEEL DAVIS,<br><br>Defendant. | Case No. 2:15-5 TLN<br><br>**DEFENDANT'S DISCOVERY MOTION**<br><br>Date: March 8, 2017<br>Time: 2:00 p.m.<br>Judge: Hon. Carolyn K. Delaney |

Defendant STEEL DAVIS submits this discovery motion seeking an order compelling the government to disclose discoverable material, including information that must be disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

I have conferred with AUSA Morris and we agreed on a hearing date of March 8, 2017.

Mr. Davis is charged with eight counts of wire fraud in violation of 18 U.S.C. § 1343 connected to "GRAP" fraud (Guard Recruiting Assistance Program). Trial is set to commence on October 16, 2017, before the Hon. Troy L. Nunley. At our December 1, 2016, trial confirmation hearing, Judge Nunley was informed that defense counsel would file this motion before the Magistrate Judge, and our previously set trial date was continued to allow the litigation of this motion.

Defendant Sgt. Steel Davis was a California National Guard recruiter working Sgt. William Davis. The two men named Davis shared the same rank and last name and their desks faced each other at the Chico Armory from 2007 through October 13, 2009, the date Sgt. William Davis was fired by the national guard for misconduct.

The defense has informed the prosecution that our defense is based on Sgt. Steel Davis being wrongly blamed for fraudulent guard recruiting transactions committed by Sgt. William Davis with former defendants / cooperating witnesses Sarah Nattress and Brian Kaps, and then for the continued fraudulent conduct by Ms. Nattress and Mr. Kaps **after** Sgt. William Davis was fired for misconduct.

The government told the defense that the California national guard is a state entity and, notwithstanding the hundreds of pages of California national guard records already provided to the defense in discovery, the federal government states it cannot obtain the state records sought by the defense.

The crux of this discovery motion is the government's failure to seek and/or disclose exculpatory impeachment material pertaining to Sgt. William Davis.

## I. ALL RECRUITING FILES WORKED ON BY SGT. WILLIAM DAVIS

In November of 2016, the government provided early Jencks discovery to the defense that disclosed two former guard recruiting assistants, Kurtis Brown and David Laubach, both of whom told military investigators that Sgt. William Davis offered to fraudulently put new recruits in their names and then split the GRAP bonus money paid to them by the Docupak accounting system.

The defense needs to review all of the recruiting files handled by Sgt. William Davis for many reasons, including (1) finding out if an extraordinarily high percentage of Sgt. William Davis's files were submitted as GRAP recruits through the "Docupak" system, (2) finding out which specific recruits handled by Sgt. William Davis were submitted as GRAP recruits so that those recruits can be interviewed by the defense, and (3) finding out which recruiting assistants were paid GRAP money for those William Davis GRAP recruits, so that we may determine if those recruiting assistants shared the money with Sgt. William Davis.

Of course, if confidential information is contained in the recruiting files, the government can provide redacted copies to the defense. If the defense needs to view the redacted information, the parties can work that out between themselves or petition the court at a later date to resolve the issue.

## II. MILITARY SERVICE / DISCIPLINE RECORDS OF POTENTIAL WITNESSES

Understandably, the government has stated that it will not call Sgt. William Davis as a government witness. The government said it will call to the witness stand cooperating military witnesses Sarah Nattress, Brian Kaps and perhaps Jason Hair. Defendant Steel Davis was also in the United States Army and the California National Guard. The defense will also call as witnesses national guard recruiters Kurtis Brown, David Laubach and Douglas Shaw, each of whom did some recruiting through the Chico Armory.

To properly assess the credibility of each of these military witnesses, the defense needs to know about their military service, including any promotions, awards, commendations, disciplinary investigations or hearings and honorable or dishonorable discharge. The defense is aware that Sgt. William Davis was fired for misconduct and the defense needs the army or national guard files and information to learn about the misconduct.

Of course, if confidential information is contained in the service files, the government can provide redacted copies to the defense. If the defense needs to view the redacted information, the parties can work that out or petition the court at a later date to resolve the issue.

## III. "GRAP RA OVERVIEW"

The government provided the defense with the GRAP RA OVERVIEW (RA = Recruiting Assistant) for Sarah Nattress and for Jason Hair. The GRAP RA overview shows (1) every recruit Ms. Nattress or Mr. Hair submitted through the GRAP program, (2) all payments each received from Docupak and (3) all computer entry comments made by Ms. Nattress, Mr. Hair and Docupak employees about each recruit.

The defense requests the same GRAP RA OVERVIEW for Ms. Nattress's fellow recruiting assistants Brian Kaps (cooperating defendant), David R. Laubach, Kurtis L. Brown and Douglas Shaw.

If the government can generate a GRAP RA OVERVIEW for one recruiting assistant, it should be able to generate the same overview for other recruiting assistants. Laubach and Brown are the recruiting assistants who told military investigators that it was Sgt. William Davis who

offered to put recruits in their names and to split the fraudulent proceeds received from Docupak and Brown stated that Shaw told Brown that William Davis was using GRAP fraudulently.

## IV. BEGINNING & ENDING DATES AND DATES & TIMES EACH SGT. DAVIS WAS WORKING IN THE CHICO ARMORY

The defense has informed the prosecution that our defense is based on Sgt. Steel Davis being wrongly blamed for fraudulent guard recruiting transactions committed by Sgt. William Davis with former defendants / cooperating witnesses Sarah Nattress and Brian Kaps, and then continued by Ms. Nattress and Mr. Kaps after Sgt. William Davis was fired for misconduct.

Accordingly, the defense needs to know the starting date and ending date that Sgt. William Davis and Sgt. Steel Davis worked in the Chico Armory. Such information will show the overlap of each Sgt. Davis at the same armory.

If the Chico Armory kept records of which specific dates each Sgt. Davis was working in the Chico Armory, the defense needs that information as well.

## V. INFORMATION FOR SARAH NATTRESS's OWN ENLISTMENT/RECRUITMENT

The government has provided the defense with the recruiting information of many dozens of California National Guard recruits, including naming the recruiter of each recruit. For example, the government provided the recruiting information for defendant/cooperating witness Brian Kaps, showing that Brian Kaps was recruited by fellow defendant/cooperating witness Sarah Nattress.

The government has not provided the same recruiting information concerning the recruitment and enlistment of Sarah Nattress, other than she enlisted in 2007 or 2008.

The defense needs the official recruiting information concerning government cooperating defendant/witness Sarah Nattress to prepare to cross-examine her and to determine how truthful Ms. Nattress was about the details of her recruitment and enlisting. Ms. Nattress worked for Sgt. William Davis when she began recruiting in the Chico Armory in 2008, submitting approximately 16 recruits through GRAP in her first 10 weeks on the job.

## VI. THE GOVERNMENT'S INVESTIGATION OF GRAP FRAUD COMMITTED OR AIDED AND ABETTED BY SGT. WILLIAM DAVIS

Defendant Sgt. Steel Davis, was a California National Guard recruiter working as a subordinate to Sgt. William Davis. They shared the same rank and same last name and their desks faced each other at the Chico Armory from 2007 through October 13, 2009, the date Sgt. William Davis was fired by the national guard for misconduct.

The defense has informed the prosecution that our defense is based on Sgt. Steel Davis being wrongly blamed for fraudulent guard recruiting transactions committed by Sgt. William Davis with former defendants / cooperating witnesses Sarah Nattress and Brian Kaps, and then defendant Steel Davis was further blamed for continued fraudulent guard recruiting transactions committed by Ms. Nattress and Mr. Kaps **after** Sgt. William Davis was fired for misconduct.

The prosecutors in our Eastern District are also investigating Sgt. William Davis for his own instances of GRAP fraud. The investigation overlaps the same time frame as the alleged GRAP fraud committed by Sgt. Steel Davis. Several of the same recruiting assistants, Sarah Nattress, Brian Kaps and David Laubach, would be directly or indirectly involved with both Sgt. William Davis and Sgt. Steel Davis.

The information gathered by the prosecution in the Sgt. William Davis investigation could help the defense prove that Sgt. Steel Davis is being wrongfully blamed for the actions of Sgt. William Davis, or impeach the claims of witnesses Nattress and/or Kaps when they claim they shared GRAP money with Sgt. Steel Davis instead of with Sgt. William Davis.

Of course, if confidential information is contained in the Sgt. William Davis investigation files, the government can provide redacted copies to the defense. If the defense needs to view the redacted information, the parties can work that out or petition the court at a later date to resolve the issue. Alternatively, the government could propose a protective order for the Sgt. William Davis investigation files.

As a matter of constitutional fairness, the government must disclose all favorable material pertaining to that incident. *See United States v. Bagley*, 473 U.S. 667 (1985) (noting that impeachment evidence falls within the *Brady* rule).

VII. RECENT CONTACT INFORMATION FOR SPECIAL AGENTS

In paragraph 33 of the Defense Discovery Request #3, the defense listed four special agents who interviewed the nine military witnesses listed in paragraph 34 of the Defense Discovery Request #3. The defense will need the special agents to be available at Steel Davis's jury trial if any of the nine military witnesses must be impeached based on inconsistencies between trial testimony and the earlier statements.

The government possesses the current contact information for each of the four special agents, two of whom were based out of Dallas, Texas, and the defense needs the contact information to be able to subpoena the special agents to trial.

However, if the government intends to subpoena each of the special agents to the October 16, 2017, jury trial of Steel Davis, and the government will state that it will not release any of the four special agents from the government trial subpenas without the defense also agreeing to release the special agent, the defense would agree that the defense does not need the contact information of the special agents.

VIII. RECENT CONTACT INFORMATION FOR MILITARY WITNESSES

In paragraph 34 of the Defense Discovery Request #3, the defense listed nine military witnesses who were interviewed by government investigators. The defense would like to contact each of the nine military witnesses and interview them and possibly subpoena them to trial. Military witnesses are inherently mobile. The government keeps track of the contact information and locations of its military personnel.

The defense requests the Court to order the government to provide the defense with the latest contact information for each of the nine witnesses listed in paragraph 34 of the Defense Discovery Request #3.

DEFENSE DISCOVERY REQUEST LETTERS

The defense sent formal discovery letters to the government dated February 5, 2016, March 15, 2016 and November 27, 2016. Each new letter repeated and updated the previous discovery requests. The November 27, 2016, letter is attached as Exhibit "A". Those letters

requested, among other material, *Brady* information and other discoverable information concerning any of the government's witnesses, as described above.

LEGAL FRAMEWORK

**A. *Brady* Impeachment Material Generally**

"Impeachment evidence … as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 153-55 (1972). Thus, the prosecution violates due process by "fail[ing] to disclose evidence that the defense might" use "to impeach the Government's witnesses by showing bias or interest." *Bagley*, 473 U.S. at 676. The information need not be admissible so long as it "is likely to lead to favorable evidence that would be admissible." *United States v. Sudikoff*, 36 F.Supp.2d 1196, 1200 (C.D. Cal. 1999).

"The prosecution's duty to reveal favorable, material information extends to information that is not in the possession of the individual prosecutor trying the case." *Amado v. Gonzalez,* 758 F.3d 1119, 1134 (9th Cir. 2014). In particular, it extends to police officer witnesses in "adopted" cases like these. *See, e.g., United States v. Price*, 566 F.3d 900, 903 (9th Cir.2009) (reversing and remanding where federal prosecutors failed to learn of exculpatory evidence in the state police's control).

The prosecution's duty also extends to situations where there is a dispute between the parties about the significance of the information. The prosecution should not "confuse[] the weight" to be given *Brady* evidence "with its favorable tendency." *Kyles*, 514 U.S. at 451. In order to qualify, the evidence need only have "some weight" that is "favorable" to the defense. *Id*. "[T]he Supreme Court has pronounced that if a prosecutor has doubt about certain evidence's exculpatory value, the prosecutor should err on the side of disclosure." *Schledwitz v. United States*, 169 F.3d 1003, 1014 n.4 (6th Cir. 1999) (citing *Kyles*, 514 U.S. at 439; *United States v. Agurs*, 427 U.S. 97, 108 (1976)); *see also United States v. Van Brandy*, 726 F.2d 548, 552 (9th

Cir. 1984) ("[t]he government, where doubt exists as to the usefulness of evidence, should resolve such doubts in favor of full disclosure"). Consistent with this principle, the Department of Justice's policies in favor of disclosure go "beyond that which is 'material' to guilt as articulated in *Kyles v. Whitley*, 514 U.S. 419 (1995), and *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999)." *See* U.S. Attorney's Manual, 9-5.001.

In order to allow Steel Davis and his defense attorney to perform any necessary further investigation based on the information disclosed pursuant to *Brady*, disclosure should be made early. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976) (calibrating due process based on the interests and burdens at stake). This should be particularly true in a case like this where (1) the government's entire case turns on one witness, (2) that witness is not a confidential informant and is accordingly in no potential danger from early disclosure, and (3) investigation and disclosure imposes no significant burden on the government relative to more complex cases.

Because Steel Davis's jury trial has not yet been held, the "materiality" prong of *Brady* is inapplicable. *See United States v. Carter*, 313 F.Supp.2d 921, 925 (E.D. Wis. 2004) (agreeing with other courts, including *United States v. Sudikoff*, 36 F.Supp.2d 1196 (C.D. Cal. 1999), *supra*, that "in the pre-trial context, the court should require disclosure of favorable evidence under *Brady* and *Giglio* without attempting to analyze its 'materiality' at trial. The judge cannot know what possible effect certain evidence will have on a trial not yet held."); *see also* U.S. Attorney's Manual, 9-5.001 ("Recognizing that it is sometimes difficult to assess the materiality of evidence before trial, prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence."). However, to the extent that the Court does engage in materiality analysis, "materiality is measured 'in terms of suppressed evidence considered *collectively*, not item by item.'" *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004) (quoting *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (emphasis added)).

**B. Federal Rule of Criminal Procedure Rule 16 and Local Rule 440**

The government has a duty, upon defendant's request, to provide the requested information to the defendant, under Federal Rule of Criminal Procedure 16(a)(1). Local Rule 440 imposes

the same requirement as the Federal Rule and provides sanctions for violations. The Local Rule requires discovery to be provided within 14 days from the date of arraignment.

Under the Federal Rules of Criminal Procedure, the government must provide discovery of materials if: (i) the item is **material to preparing the defense**; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant. Fed. R. Crim. P. 16(a)(1)(E)(emphasis added). Rule 16 also provides that "[if] a party fails to comply with this rule, the court may: . . . (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." Fed. R. Crim. Proc. § 16(d)(2)(C)-(D). Local Rule ("L.R.") 440(d) states that "[u]pon failure to provide discovery and inspection as required by this Rule, the Government . . . may be subject to sanctions as set forth in L.R. 110." L.R. 110 states that "[f]ailure of counsel...to comply with these Rules . . . may be grounds for imposition by the Court of any and all sanctions authorized by statue or Rule."

The items requested in the three discovery letters sent by the defense to the prosecution, and as requested in this discovery motion, are material to preparing Steel Davis's defense.

ARGUMENT

"The *Brady* standard is familiar: the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013) (quotations omitted). Information regarding Sgt. William Davis and the other witnesses, as discussed above is necessary for Steel Davis to properly prepare his trial defenses. Without such information, Steel Davis will not be able to fairly and fully prepare for trial and cross examine Sarah Nattress, Brian Kaps or direct Examine William Davis, David Laubach or Kurtis Brown. Steel Davis's due process and Sixth Amendment rights to a fair trial and to confront his accuser will be undermined. Nor will undersigned counsel be able to assist him effectively.

The requested information concerning could also lead to the discovery of admissible

information by providing connections with other information the defense already possesses.[1]

This evidence is not "cumulative or marginal." *Sedaghaty*, 728 F.3d at 900. Rather, it "opens up new avenues for impeachment." *Gonzalez v. Wong*, 667 F.3d 965, 982 (9th Cir. 2011). The withheld evidence would likely shade jurors' perceptions of Morales's credibility. *Sedaghaty*, 728 F.3d at 901. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 265, 269 (1969).

The Ninth Circuit described a similar set of circumstances in *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004), where "the government's case depended heavily on the jury's believing [a single witness's] testimony" and "[c]onversely, Blanco's defense depended heavily on the jury's believing that [a single witness's] was a liar." In *Blanco* the government disclosed some favorable impeachment evidence about the witness, but withheld information about the witness's immigration benefits. As in that case, here "[i]mpeachment evidence is favorable *Brady/Giglio* material 'when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence.'" *Id*. (quoting *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1458 (9th Cir.1993), *amending* 976 F.2d 1235 (9th Cir.1992)). Accordingly, the Ninth Circuit "direct[ed] the district court on remand to order the government to produce all files and other information pertaining to [that witness] in the possession of the DEA and the INS, as well as any other potentially exculpatory information that the government might have in its possession." *Id.* at 394. If anything, the information at issue in this case is more favorable than in *Blanco*.

Under the second scenario, the government may argue that it is enough for the prosecutor to "outsource" *Brady* inquiries to an investigating agent. "[T]he *individual prosecutor* has a duty

---

[1] As described above, because this discovery issue is raised at the **pre-trial** phase, the Court need not engage in a materiality analysis. And it is worth noting that the government has advanced a broad view of materiality – i.e., a standard "more favorable to the defendant" – in a case like this one where the defense makes a specific request (as opposed to a generic request or a case where there is no *Brady* request at all). *See Bagley*, 473 U.S. at 681.

to learn of any favorable evidence known to others acting on the government's behalf in the case, *including the police*." *Kyles*, 514 U.S. at 437 (emphasis added); *see also Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir.1997) (*en banc*) ("Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned."). If the second scenario represents what happened, the prosecution did not fulfill its constitutionally mandated duties under *Kyles*.

The Ninth Circuit addressed a similar circumstance in *United States v. Price*, 566 F.3d 900 (9th Cir. 2009). In that case, "the prosecutor instructed his lead investigative agent, a member of the Portland Police Department, 'to run a criminal history check on [a witness].'" *Id*. However, that check apparently did not uncover certain impeachment evidence concerning the witness's criminal record. *Id*. The Circuit began its analysis by noting the district court's erroneous analysis:

> The [district] court held that no Brady violation occurred in this case because the prosecutor did not *personally have in his possession* the evidence of Phillips' prior arrests, conduct, and convictions. In ruling on Price's new trial motion, the district court stated that "the core of [a Brady violation] is the Government has to either intentionally ... or through some kind of misunderstanding or negligence fail to disclose what it has. Here most, if not all of what is alleged to have not been disclosed wasn't known [to t]he Government-the prosecutor at least didn't have it. So we don't have [a Brady violation]."

*Id*. at 908 (emphasis added). As the Circuit noted, this represented a misunderstanding of *Brady* doctrine. Rather, "[t]he Supreme Court has clearly held that '*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Id*. (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (*per curiam*). Thus, "the prosecutor's lack of personal knowledge of the *Brady* material" was irrelevant. *Id*.

*Price* discusses two basic rules that potentially apply under the second scenario described above: First, "a prosecutor cannot evade [*Brady*] simply by becoming or remaining ignorant of the fruits of his agents' investigations." *Id*. at 903. Second, "exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does." *Id*. at 909. Thus, a perfunctory inquiry or a withholding by San Joaquin County officers themselves would represent *Brady* violations. *See United States v.*

*Blanco*, 392 F.3d 382, 393-394 (9th Cir. 2004) (finding *Brady* violation where "the DEA was providing information to the AUSA only reluctantly, and in some instances not at all" because "[t]he obligation under *Brady* and *Giglio* is the obligation of the government, not merely the obligation of the prosecutor").

Finally, if the third scenario represents what happened, that too would present a serious problem under *Brady* and procedural due process more generally. In order to allow the defense to adequately prepare cross examination, prepare defense exhibits and perform necessary further investigation based on the information disclosed pursuant to *Brady*, production on the eve of trial would be unfair. Under the three-prong *Mathews v. Eldridge*, 424 U.S. 319 (1976) procedural due process framework, there can be no justification for delayed *Brady* production in a case like this. *See e.g., Ake v. Oklahoma*, 470 U.S. 68 (1985) (applying *Mathews* framework to require an independent examination for defense preparation). The *Mathews* framework balances (1) the interests of the individual; (2) the risk of error under the default procedure and the value of additional safeguards; and (3) the burden of the additional safeguards.

Here this balance tips in favor of Mr. Steel Davis because (a) the government's entire case turns on the credibility of only two convicted cooperating witnesses (defendant Nattress and defendant Kaps), (b) the cooperating witnesses are not confidential informants and there is accordingly in no potential danger from early disclosure, and (c) investigation and disclosure imposes no significant burden on the government relative to more complex cases. This is simply not a case where delayed disclosure is justified.

DATED: February 10, 2017

Respectfully submitted

*/s/ Michael D. Long*

MICHAEL D. LONG
CJA Attorney for STEEL DAVIS

**MICHAEL D. LONG**
Attorney at Law
California State Bar Number 149475
901 H Street, Suite 301
Sacramento, CA 95814
Telephone: (916) 201-4188
Facsimile: (916) 442-8299
Email: Mike.Long.Law@msn.com

CJA Attorney for STEEL DAVIS

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>STEEL DAVIS,<br>Defendant. | Case No. 2:15-5 TLN<br>**DECLARATION OF COUNSEL**<br>Date: March 8, 2017<br>Time: 2:00 p.m.<br>Judge: Hon. Carolyn K. Delaney |

I, Michael D. Long, declare as follows:

1. I am licensed to practice law in the state court of the State of California and in the federal courts of the Eastern District of California. I am the court-appointed lawyer for Steel Davis.
2. Attached as Exhibit "A" is a true and correct copy of the discovery letter I provided to AUSA Matt Morris on November 27, 2016. The discovery letter was an updated version of the same discovery letter I had previously provided to AUSA Matt Morris on February 5, 2016 and on March 15, 2016.

I declare under the penalty of perjury that the above is true and correct. Executed at Sacramento, California on February 10, 2017.

*/s/ Michael D. Long*
MICHAEL D. LONG
CJA Attorney for STEEL DAVIS