PHILLIP A. TALBERT
United States Attorney
MATTHEW G. MORRIS
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEEL DAVIS,<br><br>Defendant. | CASE NO. 2:15-CR-5-TLN<br><br>OPPOSITION TO DEFENDANT'S MOTION FOR DISCOVERY<br><br>DATE: March 8, 2017<br>TIME: 2:00 p.m.<br>COURT: Hon. Carolyn K. Delaney |

## I. **FACTUAL BACKGROUND**

During the height of the Iraq and Afghanistan wars, the National Guard was having trouble making their recruiting goals.[1] The United States government, via the federal National Guard Bureau, established a program called the Guard Recruiting Assistance Program, commonly referred to as G-RAP. G-RAP enabled current or retired members of the Guard who signed up to become "Recruiting Assistants" (RAs), to refer individuals within their "spheres of influence" to join the Guard. A company called Document and Packaging Brokers, Inc. ("Docupak") administered G-RAP for the Department of Defense. Docupak set up an online portal through which RAs were trained, applied for compensation, and made notes regarding each person the RA encouraged to join the guard (referred to as a "nominee"

[1] Facts discussed herein are either reflected within the discovery provided to the defendant or reflect summaries of testimony that has previously been presented to juries in this district in similar cases, including *United States v. Sihner*, 2:14-cr-141-JAM, and *United States v. Cuenca*, 1:14-cr-106-DAD.

or "potential soldier").

To activate his or her Docupak account and register as an RA, RAs were required to complete a training through an online portal. The training modules made the commonsense point that RAs could not claim G-RAP payments by nominating people they did not know and had not referred to the Guard.

After completing training, an RA could nominate a potential soldier through the Docupak-administered online portal. The nomination process in the online portal required the RA to enter certain personal information about the nominee, such as date of birth and social security number, and answer basic survey questions about how they knew the nominee. These questions included "How/where did you meet your Potential Soldier?" and "What interests them about the Guard?" After claiming a potential soldier in the G-RAP system, the RA was supposed to arrange a meeting between the nominee and a full time Guard recruiter, such as former Sergeant Steel Davis, the defendant in this case. When an RA nominated a soldier and referred them to a recruiter such as Davis, the recruiter received an automated email to inform them that a nomination process had begun.

RAs would typically receive a $1,000 payment when a nominee signed an enlistment contract and a second $1,000 payment when the nominee left for boot camp. In some cases, an RA received a single $2,000 payment. The purpose of the RA was to bring people in the recruiter's door and put them in touch with a recruiter. No G-RAP payments were supposed to be made for soldiers who walked through the door on their own initiative, without having been referred by an RA.

The G-RAP program, while well-intentioned, turned out to rely too heavily on the honesty of people like Steel Davis. It was eventually shut down when extensive fraud was uncovered through an Army audit, which subsequently became a criminal investigation. In this district, seven members of the California National Guard have been indicted for their roles in the resulting fraud.[2] If a potential soldier showed up at the recruiting station already having decided to join the guard (*i.e.*: without having been referred by a recruiting assistant) there was little to prevent corrupt recruiters from slipping the recruit's information to a corrupt RA, who then falsely claimed to have referred the recruit and requested a

---

[2] Other than Davis, those cases are: *United States v. Pesta*, 1:14-cr-107 DAD; *United States v. Huerta*, 1:14-cr-108-LJO; *United States v. Maldonado*, 1:14-cr-109 LJO; *United States v. Sihner*, 2:14-cr-151-JAM; *United States v. Nattress*, 2:14-cr-152-TLN; and *United States v. Kaps*, 2:14-cr-153-TLN.

referral bonus. Because the RAs were required to make assertions about certain material facts to prove that they were entitled to the bonuses, and because those bonuses were paid by interstate bank wires, the resulting fraudulent bonus payments constituted wire fraud.

The defendant in this case is charged with eight counts of wire fraud for payments made to two RAs between February 2010 and January 2011. ECF 1. Four of those wires were fraudulent referral bonuses claimed by RA Brian Kaps. Kaps has pled guilty in case 2:14-cr-153-TLN. The other four wires were fraudulent referral bonuses claimed by RA Sarah Nattress. Nattress has pled guilty in case 2:14-cr-152-TLN. The government anticipates that Kaps and Nattress will both testify that they conspired with defendant Davis to defraud the G-RAP program, that they were given the names and social security numbers of potential soldiers by Steel Davis for the purpose of making fraudulent bonus requests, and that they paid one half of the proceeds of the fraud to Steel Davis in the form of cash kickbacks for him providing them with those names.[3]

The government has provided approximately 875 pages of discovery to defendant Davis since the inception of this case. The full scope of everything provided to the defense would take quite a bit of space to catalog, much of which would be irrelevant to this motion. Examples of the discovery relevant to this motion, however, are attached to this pleading and include:

- Records previously maintained by Docupak showing their database entries for particular RAs, including Kaps, Nattress, and a third RA named Jason Hair (*see, e.g.*, Exh. A);
- Records previously maintained by Docupak showing their database entries for particular recruits, including biographical information about the recruiting process and records of the statements made by the RAs to Docupak to fraudulently induce Docupak to pay the bonuses (see, e.g., Exh. B);
- Reports written by law enforcement officers when they interviewed the recruits in question to ask them whether the RAs had done anything to earn the G-RAP bonuses (*see, e.g.*, Exh. C);

[3] Because professional recruiters like Steel Davis were ineligible to participate in the G-RAP program, they needed a cooperating RA to make the fraudulent claims. There was no way for Davis to submit a fraudulent G-RAP bonus on his own.

- Bank records for RAs showing the wires arriving from Docupak and, in many instances, immediately being withdrawn in cash (*see, e.g.*, Exh. D);
- Reports written by law enforcement officers when they interviewed 14 additional recruits, who had been fraudulently claimed by RAs other than Nattress, Kaps, and Hair, to ask them whether the RAs had done anything to earn the G-RAP bonuses (*see, e.g.*, Exh. E).

Thus, using the materials contained in the examples at Exhibits A through D, the government has sent Davis everything contained in the Docupak database about recruit named Alexander Anton (Exh. B), everything contained in the Docupak database about RA Kaps (Exh. A), records of the date that Kaps was sent wire payments for allegedly referring Anton (Exh. A), bank records showing the money for Anton arriving in Kaps's bank account (Exh. D), and a written report documenting Anton's original statement to law enforcement (Exh. C).

Many items requested in the defendant's motion were contained in a discovery request sent to the government on November 27, 2016. Exh. F. The government replied on November 30, 2016. Exh. G.

## II. <u>ARGUMENT</u>

### A. <u>Relevant Law</u>

"There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Over time, a patchwork of statutory and judge-made rules has evolved to govern criminal discovery. Those rules include 18 U.S.C. § 3500 (the *Jencks* Act) and Federal Rule of Criminal Procedure 26.2 governing witness statements; Federal Rule of Criminal Procedure 16; *Brady v. Maryland*, 373 U.S. 83 (1963); and *Giglio v. United States*, 405 U.S. 150 (1972).

The *Jencks* Act provides that "In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of ... discovery ... until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500.

Likewise, Rule 26.2 governs only the statements of witnesses who have "testified on direct examination." Fed. R. Crim. P. 26.2. And unless a witness statement is otherwise covered by Rule 16,

that rule does not "authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16.

Rule 16 only requires that the government disclose, upon request of the defendant, seven categories of information. Unless information otherwise falls into one of those seven categories, the "rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16.

*Brady v. Maryland* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In *Giglio v. United States*, the Supreme Court extended the *Brady* principle to include evidence that impeaches a witness's credibility. *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011) (citing *Giglio*, 405 U.S. at 154). As for timing, "*Brady* evidence is to be disclosed to the defense at a time such that the defendant is able to put the evidence to meaningful use, i.e., perform the necessary investigation and follow-up. However, *Giglio* evidence need not be disclosed until a witness testifies: '[s]ince information concerning favors or deals merely goes to the credibility of the witness, it need not be disclosed prior to the witness' testifying." *United States v. Hopkins*, CR S-05-0538 EJG GGH, 2008 WL 4453583 (E.D. Cal. Oct. 3, 2008) (citing *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988); *United States v. Rinn*, 586 F.2d 113, 119 (9th Cir. 1978)).

**B. <u>Davis requests items in this motion that he has never previously requested.</u>**

In November 2016, Davis requested a "GRAP RA Overview" for a person named Laubach. Exh. F ¶ 28. The government's response to Davis (regarding Laubach) is discussed below in Section II.E.2. In his motion, however, Davis now moves the Court to order that somebody (presumably the government) be tasked to create for him a "GRAP RA Overview" for two additional people: Kurtis L. Brown and Douglas Shaw. ECF 41 at 3-4. While the Court's local rules requiring efforts to meet and

confer before filing motions apply explicitly to civil discovery disputes, it certainly would be easier for the government to work with a defendant if he would request items informally before filing a motion with the duty magistrate. It is, therefore, not clear if "GRAP RA Overviews" already exist for these two people because the first time Davis made any mention of them was in this motion. With respect to Mr. Brown, the discovery already provided to Davis shows that Brown refused to commit fraud like so many other people around him. Thus, given that Brown declined to participate in the G-RAP fraud, it is highly unlikely that any G-RAP records exist for Mr. Brown.

Nevertheless, even if RA records do exist for Brown and Shaw, they do not appear to be discoverable. As Davis concedes in his motion, neither of these two people appear to have had any interaction with the defendant or any of the recruits attributable to the defendant. Brown stated in an interview that William Davis offered to let him in on the action, which he declined, and Shaw is described (by Brown) as somebody who knew that William Davis was committing fraud and did not turn him in. Neither of them are involved in the recruitment of any of fraud charged in this indictment. To the extent that any GRAP records exist for either of them, they would not be relevant to this case.

**C. Davis requests items from the government that have already been provided to him.**

Davis asks this Court to order the government to turn over a "GRAP RA Overview" for RA Kaps including "payments made for all the recruits" of Kaps. ECF 41 at 3-4. The government has already provided that information and has previously reminded the defense of that fact. In his November 27, 2016, letter, one of the many new items that the defense requested from the government was a GRAP RA Overview for Kaps. Exh. F at ¶ 28. In reply, the government wrote:

> Please refer to page 56 of the discovery, which is a page that bears the title "Recruiting Assistant Overview: BRIAN KAPS." If you have in mind something other than page 56 when you stated that you are requesting a "GRAP RA Overview" for Kaps, please clarify what it is that you are looking for. The information about payments made to RA Kaps was previously provided. Please advise if you have misplaced that portion of the discovery or never received it.

Exh. G ¶ 28. Davis has never responded to the government's request that he explain what he means by a "GRAP RA Overview" if it is anything other than the items that were previously provided to him, and which were clearly marked as "Recruiting Assistant Overview: Brian Kaps." Nor has he ever replied to the government's request that he either confirm that the discovery contains the payment records or

confirm that he is missing the discovery. The government even went so far as to point Davis to the exact page of the discovery (Page 56) where that information began. If this "Recruiting Assistant Overview" is not the "GRAP RA Overview" that Davis is looking for, the government has expressed a willingness to work with him to figure out what he is looking for and where it might be. But if Davis is simply cutting and pasting requests for documents that were already sent to him two years ago (even after he was pointed to the correct page of discovery by the government) there's only so much that can be done. To make this abundantly clear to the Court and the defendant: the government believes that Exhibit A to this pleading, which contains information given to the defendant all the way back on January 13, 2015, contains the GRAP RA Overview for Kaps, and also includes information about all the payments made to him. If there is something else that Davis wants regarding Kaps, he has never told the government what it is.

**D. Davis requests items that are not in the government's possession.**

Large swaths of Davis's discovery request seek materials that are not in the government's possession. It is not the government's obligation to do Davis's investigation for him. The government's obligations extend only to items and information in its possession, and to make reasonable efforts to locate exculpatory information or impeachment information for government witnesses. The government has done so and has informed Davis that it will continue to do so.

For example, Davis requests "all recruiting files worked on by Sgt. William Davis." ECF 41 at 2. While it is unclear what items Davis would lump into the term "recruiting files," he has previously requested "all enlistments, even if not through GRAP or Docupak, for all (CANG) recruits ever signed up by, or referred by, (a) Sgt William Davis." Exh. F ¶ 2 (emphasis added). While the government possesses some G-RAP records regarding William Davis, the government does not have military recruiting records for any non-G-RAP California national guard recruits who were processed by William Davis. Given that the government has been investigating these suspects for G-RAP-related fraud, the government has never sought (or been provided) recruiting records related to any non-G-RAP recruits, whether they were Steel Davis's recruits or William Davis's recruits. If those records exist, they would be in the possession of California National Guard. The same is true of the "recruiting file" of witness Nattress. ECF 41 at 41. If the defendant is requesting Docupak records for Nattress (rather than an

"enlistment file"), the government would be happy to see if there are any such records available at Docupak or at the Department of the Army.

Nevertheless, to the extent that the government has Docupak records related to G-RAP fraud for William Davis, many of those files have been produced in an abundance of caution to err on the side of over-production rather than under-production. At the defense's request, in the summer of 2016, the government gathered records related to William Davis's G-RAP recruits to ascertain whether Steel Davis was in a position to cooperate with the government in the prosecution of William Davis. Items related to William Davis, which the government obtained in the interest of working with Steel Davis to recollect frauds he might have been aware of, were then turned over at pages 733-747 of the discovery. This includes a number of reports related to William Davis's frauds.

Davis also seeks what he calls "military service / discipline records of potential witnesses." ECF 41 at 3. For reasons that are set out below in Section II.E, even if the government had complete copies of the personnel files of these state employees, we would not turn them over in their entirety. But the motion fails for a different reason: the items he requests are state employment files and the government has repeatedly told Davis that we do not have access to those state files. Nevertheless, the government has repeatedly offered to work with Davis to figure out a way to help him find what he is looking for. In August 2016, in response to this broad request by Davis to rummage through people's state personnel files, the assigned prosecutor wrote:

> The only items that are likely to be problematic are the National Guard personnel files of witnesses. Since those are state records (not federal) we don't have access to them. And of course, even if they were federal employees there is no way that we would ever produce full employment personnel files. The best we would ever do is to review (or have the agency review) for impeachment / Giglio/ Henthorn information, and then submit that to a judge for determination if it is discoverable. But since I'm not aware of any way that the federal government can demand state National Guard employment files for those witnesses, I think even that is more than we can realistically hope to be able to obtain for you.
>
> I'll ask the federal agents if they know of any route that you can use to obtain state national guard records. This might be a *Pitchess* type of situation, or if you know that these records exist, you might need to use Rule 17 subpoenas to the State of California.

Exh. H. Davis never replied to this effort by the government to find a way to help him acquire what he believes he needs. Indeed, in November 2016 he simply re-submitted the same request, this time in bold

typeface to help the government separate which of his various requests were still of concern out of the many pages of boilerplate requests and requests for items that he conceded he had received. Exh. F. In reply, the government cut and pasted a block quote of the August reply set out above, and then added:

> Our position has not changed. We will make reasonable efforts, consistent with our obligations under *Giglio* and *Henthorn*, to locate impeachment information for any witness that we intend to call at trial. We do not have, we will not obtain, and we would not turn over if we did obtain them, the full personnel files of any witness, let alone somebody like Sgt. William Davis, whom we do not intent [sic] to call at trial as a witness.
>
> In addition, we will have rap sheets for all government witnesses, not just military witnesses, available for inspection at our office prior to trial, and we will have those rap sheets in the court during trial.

Exh. G ¶ 5.

To date, the defense has never expressed any interest in working with the government to identify California records that contain impeachment information. The government does not have the employment files for California National Guard employees. While we will comply with our obligations under *Giglio* and *Henthorn* for <u>government</u> witnesses (and will turn over discoverable impeachment information that we receive), we will not seek impeachment information for <u>defense</u> witnesses. If the defense would make some reasonable effort to meet and confer, we have offered (repeatedly) to help defense counsel get in touch with whatever state office maintains those National Guard personnel records, but those efforts to help the defense have been met with boilerplate discovery letters followed by this motion.

It appears that this entire dispute might boil down to a misunderstanding by Davis about the nature of the material already provided by the government. He argues that "notwithstanding the hundreds of pages of California national guard records already provided to the defense in discovery, the federal government states it cannot obtain the state records sought by the defense." ECF 41 at 2. Nonsense. The government has not turned over to the defense a single page of any "California national guard records" let alone "hundreds of pages" of such records. The records provided to the defendant are <u>Docupak</u> records, not California state agency records. As described above (and set out in detail in the indictment) the federal government had a contract with Docupak to administer a nationwide program under the federal National Guard Bureau, which is a portion of the United States Department of

Defense. Accordingly, Docupak (not the California National Guard) provided documents pertinent to these crimes to federal law enforcement agents. Those federal agents, including the FBI and Army CID, then conducted interviews, and various other records were obtained by grand jury subpoena. Nothing that the government has provided to the defendant constitutes a California National Guard record.

As set out repeatedly to the defense, the government will work with him to locate the right people within the state of California for him to file any requests for disclosure of state personnel files to him in preparation for trial if he believes that he has a legal basis to compel the state to give over those records. For government witnesses, the prosecution will make appropriate *Giglio* and *Henthorn* inquiries before trial, and if Judge Nunley determines that any material unearthed in that process is discoverable, we will produce it.

For the same reason, the federal government does not have "the starting date and ending date" of either Sgt. William Davis's service in the Chico National Guard armory, or Sgt. Steel Davis's service in that same armory. The federal government is able to locate basic information about dates that National Guard members are either in the Guard or out of the Guard. In the interest of helping Davis to this effect, a government law enforcement agent generated a report setting out those dates for William Davis. That information was provided to the defense at page 729 of the discovery. The federal government does not keep records about the day-to-day activities of California National Guard members, with the possible exception of Guard members who have been called into Federal service during the duration of that Federal service. Accordingly, the government does not have "records of which specific dates each Sgt. Davis was working in the Chico Armory." ECF 41 at 4. It seems highly unlikely that the State of California has such records, but that is a matter for Davis to discuss with the State of California.

As the government previously reminded the defense, this information, to the extent it exists, is equally available to the defense as it is to the government. When Davis previously requested that the government go find employment dates regarding William Davis, the government replied:

> This is an interrogatory. There is no provision in the Federal Rules of Criminal Procedure for the defense to lodge interrogatories to the government. You might want to hire an investigator to contact William Davis to see if he will talk to you about the facts that are responsive to this interrogatory.

Exh. G ¶ 30. Likewise, on the question of which dates Steel Davis was working in the armory, the

government reminded counsel that:

> Your client is likely the person with the best information in response to this interrogatory, and perhaps he can suggest to you a witness that you can call to fill in any gaps in your client's memory.

Exh. G ¶ 31. This remains the case to this date. Undoubtedly there are a plethora of witnesses whom the defendant can call upon who can testify about who was working in that armory on certain dates. If the government locates any witnesses while preparing for trial who may testify regarding such information, those witness interview reports will be turned over as early *Jencks* material – just as the government has already done for dozens of other potential witnesses. But the government cannot produce that which it does not have.

**E. <u>Davis requests items that, even if they were in the government's possession, would not be subject to discovery.</u>**

Beyond the requests Davis makes for items that are not in the government's possession, he also has made a series of requests for materials that, even if the government had them, would not be subject to disclosure.

1. Personnel Files of Potential Government and Defense Witnesses

One category of such materials includes the military and personnel records of both potential government and defense witnesses. As noted above, many of the items that Davis is asking for are actually California state employment records, and are therefore not in the government's possession. But even if the state were to let the federal government review those records, the full records themselves would not become discoverable, as requested by the defendant. The government's *Henthorn* obligations have arisen for exactly this purpose: even federal law enforcement agencies do not simply turn over complete employment records to the government for us to peruse or to give to the defendant. *United States v. Henthorn*, 931 F.2d 29, 31 (9th Cir. 1991) ("The files need not be furnished to the defendant or the court unless they contain information that is or may be material to the defendant's case.") Even after *Henthorn*, the government "is not obligated to review state law enforcement files not within its possession or control. The district court lack[s] the authority to require agency counsel and department heads to participate in the review of the files." *United States v. Dominguez-Villa*, 954 F.2d 562, 566 (9th Cir. 1992). *Henthorn* requirements thus only extend to federal law enforcement witnesses, and only

witnesses who testify at trial.

Thus, although Davis might have intense curiosity about what kind of impeachment material is contained in the state personnel files of his own witnesses, nothing therein is discoverable. And Davis is clear: he seeks the personnel files for Brown, Laubach, and Shaw because he intends to call them as his witnesses, not because the government is calling them. ECF 41 at 3. Likewise, the government has made clear that it does not consider William Davis a potential government witness.

Of course, as in every case, the government will go beyond its discovery obligations under the law and will not only have a "candid conversation" with every government witness to make a good faith effort to locate impeachment information, but will also make U.S. Attorney's Office-wide inquiries to be sure that no person has knowledge of impeachment information that can be imputed to the government. Any such information located by the government will be presented to Judge Nunley for *in camera* review, and if Judge Nunley determines that it is discoverable, the government will produce that material consistent with Judge Nunley's orders.

2. "Enlistment Files" Regarding William Davis's Recruits, the Government's Investigatory File on William Davis, and Docupak Records Relating to RA Laubach.

It is not clear exactly what Davis means by an "enlistment file." Where he discusses Nattress's "file," he seems to conflate the term "enlistment file" with the Docupak records related to Nattress's recruitment. See ECF 41 at 4 (requesting records for Nattress that would be similar to Docupak records regarding Kaps already provided in discovery). As discussed above, if Davis is seeking California state employment records, rather than Docupak records, the government does not have those. Assuming that what Davis meant to ask for are Docupak records related to these other recruits, there is no basis for their disclosure. Likewise, the defendant's desire to review the government's investigation on William Davis has no basis in any discovery obligation of the government.

a. The government has turned over all of the Docupak records for the charged wires.

Davis is charged with eight wirings that happened in 2010 to 2011. Those eight wirings involved RAs Nattress and Kaps, and the counts of the indictment make clear the initials of the relevant recruits and the initials of which of those two RAs was involved. The five recruits in question are

Anton, Jensen, Blair, Gregory, and Williams. The government has turned over every item in its possession that relates to those five recruits. These records include the recruits' G-RAP recruiting records, records of payments sent to Nattress and Kaps, and records about the false statements made by Nattress and Kaps to induce Docupak to send that money. The government has also provided early *Jencks* material for all five of these witnesses. As discussed above, using recruit Anton as an example, there is nothing in the government's possession that has not been turned over. Early *Jencks* material from law enforcement interviews were also included. Every one of these five recruits started their enlistment process after William Davis left the California National Guard, and the government has previously provided a report to this defendant documenting the fact that every action associated with these fraudulent bonuses occurred after his purported scapegoat (William Davis) was long gone.

b. The government has turned over all of the Docupak records for every recruit assigned to RAs Nattress, Kaps, and Hair for which payments were sent.

Beyond the eight charged wirings, the government has turned over all of the Docupak records for twenty-one <u>additional</u> recruits who were claimed by Nattress, Kaps, and Hair regardless of whether Steel Davis or William Davis was listed as the recruiter on those Docupak records. Just as with the eight charged wires, these records include the recruits' G-RAP recruiting records, records of payments sent to Nattress, Kaps, and Hair, and records about the false statements made by Nattress, Kaps, and Hair to induce Docupak to send that money. Early *Jencks* material from law enforcement interviews were also included.

c. The government has turned over interview reports for additional recruits who were falsely claimed by RAs Laubach and Martini.

Beyond RAs Nattress, Kaps, and Hair, the government has interviewed a number of soldiers who were nominated by RAs Laubach and Martini, regardless of whether Steel Davis or William Davis was their recruiter. The government has turned over those interview reports.

d. Any remaining records regarding William Davis's recruits are not subject to discovery.

Davis, at least, does not disguise his intentions, and that dooms his motion. He concedes that he is on a fishing expedition hoping to find other instances of fraud committed by William Davis. ECF 41 at 5. However, whether William Davis also committed fraud (with other RAs) is not relevant to the

government's fraud case against Steel Davis and these RAs. Mindful that large block quotes are frowned upon, the government's response to the defendant's request to rummage about in the government's case file on William Davis remains as appropriate today as it was in November:

> Given that the discovery already provided in this case demonstrates that all eight charged wirings were both paid and nominated long after Sgt. William Davis had left the national guard, your client's effort to blame Sgt. William Davis for his actions is specious. As a courtesy to you, we have already located the date that William Davis left the California National Guard and provided that to you in discovery. If the focus of your client's defense will be to attempt to blame Sgt. William Davis for any other (uncharged) fraudulent bonuses that the government introduces at trial, the defense will have the opportunity to cross examine the government's witnesses. Alternatively, your client can locate and call Sgt. William Davis if you believe that he has information that will exonerate your client. No member of the prosecution team has interviewed him and we are not aware of any information in his possession that is exculpatory. To the extent that the government has any information about Sgt. William Davis's involvement in recruiting any of the government's witnesses, you have already received everything in the government's possession about those witnesses' recollection of events and what interaction they had, if any, with Sgt. William Davis. If any of the government witnesses' recollections change in preparation for trial, the government will supplement discovery by providing additional pre-trial *Jencks* material for those witnesses.

Exh G. ¶ 33.

The government expects to call between 5 and 26 recruits at trial, and everything in the government's possession as to those recruits has been provided to the defendant. Those recruits will say that they interacted with Steel Davis, not William Davis. *See e.g.* Exh. C. Those recruits' Docupak records will show that Steel Davis, not William Davis, was the recruiter that they were working with. *See, e.g.*, Exh. B. Testimony at trial is expected to demonstrate that where "Steel Davis" is listed as the recruiter on the Docupak records, he received an email alerting him that the RAs had claimed to have sent him a new referral. And many of these recruits had never stepped foot inside the Chico or Oroville national guard recruiting offices until long after William Davis had left the National Guard.

Whether or not William Davis (who is not a government witness) committed additional frauds with other RAs (who are also not government witnesses) involving bonuses for other recruits (who are also not government witnesses) is not even remotely exculpatory on the issue of whether Steel Davis committed fraud with these RAs and these recruits. It is not material to whether Steel Davis committed the charged frauds, because it is not a defense to this crime to claim that somebody else (William Davis)

also committed a similar crime. *Brady*, 373 U.S. at 87; *Kohring*, 637 F.3d at 902; *Bagley*, 473 U.S. at 682.

For the same reason, any fraud committed by William Davis with other recruits is not material to the preparation of the defense. A defendant must make a threshold showing of materiality, which requires a presentation of "facts which would tend to show that the Government is in possession of information helpful to the defense." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990). "Neither a general description of the information sought nor conclusory allegations of materiality suffice." *Id*; *United States v. Santiago*, 46 F.3d 885, 894–95 (9th Cir. 1995).

Finally, because the government is not calling William Davis, or his RAs Laubach and Martini, or any of the recruits who show up as a William Davis recruit in the Docupak records, the government does not have, and never will have, any obligation under the *Jencks* Act or Rule 26.2. Because the government's *Giglio* obligations extend only to its own witnesses, any impeachment material in government records related to these other people is not subject to discovery. *Giglio*, 405 U.S. at 154. Even then, the government would not need to turn any such materials over until they have testified. *Gordon*, 844 F.2d at 1403.

3. Contact Information for Defense Witnesses and Law Enforcement Agents.

Davis seeks an order from the court compelling the government to provide personal contact information for government law enforcement agents. In replying to this request in November, the government wrote:

> I suggest that you or your investigator contact the California National Guard or the Army Criminal Investigation Command. If the government places any of those people under subpoena, we will not release them without conferring with you. However, (and as you surely know the government's witness list might change between now and trial) we do not currently plan to call any of those four people as witnesses. If you want them for your case, you should not rely on the government having them under subpoena for you.

This remains the case. If Davis would like Army agents to be available for him at trial, he needs to comply with the Department of Defense's *Touhy* regulations. The "Housekeeping Statute," 5 U.S.C. § 301, provides in part that executive agencies may prescribe regulations regarding the custody of its records. 5 U.S.C. § 301. Pursuant to this statute, many federal agencies have promulgated regulations

that prescribe the manner in which their employees must respond to litigants' subpoenas for official information. The validity of these regulations was explicitly upheld by the Supreme Court in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). As a result, the regulations are commonly known as "*Touhy* regulations." As the Supreme Court said:

> When one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious.

*Touhy*, 340 U.S. at 468. The Ninth Circuit has upheld holding criminal defendants to their *Touhy* obligations in criminal cases. *United States v. Henson*, 123 F.3d 1226 (9th Cir. 1997) (while a *Touhy* regulation "does not allow an agency to refuse to disclose information, it does allow an agency to choose who may disclose the information and the procedure to be followed for such disclosure."). The government is thus not obligated to give a criminal defendant the personal contact information of a federal law enforcement agent for the purpose of serving that agent with a subpoena. The proper route for Davis is to comply with the Army's *Touhy* regulations to obtain his witnesses for trial.[4]

Likewise, Davis's request for the government to track down contact information for his witnesses for him is inappropriate. As the government previously wrote: "This is an interrogatory. There is no provision in the Federal Rules of Criminal Procedure for the defense to lodge interrogatories to the government. I suggest that you hire an investigator to locate those people."

---

[4] The government does not concede that the testimony of the law enforcement agents would be admissible. Davis seems to intend to call these people to discuss other frauds committed by William Davis. It is unlikely that testimony about other people's crimes is admissible in a case about Steel Davis's crimes.

## III. CONCLUSION

The defendant's motion should be denied. He seeks information already produced, information not within the possession of the government, and information that would not be subject to disclosure even if it were in the government's possession or control.

Dated: February 27, 2017

PHILLIP A. TALBERT
United States Attorney

By: /s/ MATTHEW G. MORRIS
MATTHEW G. MORRIS
Assistant United States Attorney